Good morning. May it please the Court, my name is David Berg and I am honored to represent the appellants in this appeal, Douglas Thompson, John Hellowell, and Robert Siebenberg, who are three of the original five members of the commercially successful and critically acclaimed band Supertramp. Parties to this appeal agree that it turns entirely on a question of contract interpretation. Therefore, it's purely a legal function for this Court to review on a de novo basis. The central issue in this appeal is the following. At the time these parties entered into their contract, that's the subject of this appeal, in 1977, was there a future event that, number one, certainly would occur at some point, even if many years down the road? Number two, when it occurs, it will be, quote, ascertainable. And number three, that that, quote, ascertainable event, quote, necessarily will imply the termination of the party's 1977 contract. The answer to all three of those questions is a resounding yes. At some point in the future, the music publishing revenue that is the subject of this, of the party's contract, will cease. It will stop flowing, probably when the copyrights expire, because the revenue- That was my question. Did anybody argue about the duration of copyright? Like, what is the duration of copyright for music royalties? Well, it depends on which, on the time of the composition and the time of the registration. But under the current Copyright Act, it's the normal, I guess it's 95 years with the Sonny Bono extension. Your Honor, I don't know the date, but years down the road. We're not close. And these, you know, the songs were composed in the 70s and early 80s. Some of the older ones were registered under the 1909 Act. Therefore, there was a renewal term, and the copyrights were renewed. The only thing that's happened, Your Honor, is that some of the grants have been terminated. And, you know, the current Copyright Act provided for termination rights under both the old Act and the current Act. And so some of the older Act grants have been terminated, but that is in no way, those are just grants from composer to publisher. The copyrights are extended. But at some point, they will fall into the public domain. Therefore, there will be no reason for anybody to license these songs. Or perhaps even earlier than that, Supertramp's music will fall out of public favor, and there just won't be a demand. But at some point, the money will stop. And when that stops, that will necessarily imply termination of the agreement, because there will be nothing further to do. If there's no money to allocate, then there's no contract that requires the allocation. Given that reality, the district court under clear, established California law, which is consistent with law in New York and around the country that we've found, the district court below was required as a matter of law to find that the implied term of the contract was until the publishing royalties ceased. That's what the parties had in mind, as the case law clearly demonstrates. The contrary finding by the court that there was neither an express nor an implied term, that it was, the court found that it was impossible from the circumstances to imply a term. That's contrary to the case law. That was clear, reversible error. The court wrongly concluded that this contract could be terminated unilaterally by Mr. Hodgson after a reasonable time. And again, that is contrary to every case that we've found in which the covenant at issue was an allocation of a revenue stream. In fact, the only kinds of cases that are contrary to this line of holdings are cases involving exclusive distributorships, for example, or license options in which there would be no ascertainable future event that necessarily would imply termination. The court was required to make the finding of this implied term unless there was, quote, no suggestion in the entire record in the circumstances of the contract, in the party's course of conduct for decades before this dispute arose in 2018. The court had to find that there was no suggestion. And again, that is just contrary to the case law, which effectuates the primary goal of contract interpretation, which is to effectuate the intent of the contracting parties. And all of the evidence manifests the understanding of the parties at the time they entered into this agreement that it would continue for so long as the revenue flow continued. And the most important example of that, perhaps, is the year-long negotiation by appellee Mr. Hodgson of his 1984 termination agreement from Supertramp, which contains numerous detailed provisions that were intended to maintain the very specific allocation that the parties had entered into seven years earlier. If he truly thought he could just terminate the agreement, he would have done so and not spent a year negotiating true-ups and notifications and all the rest that we've pointed out. So the appellees attempt to deflect this straightforward result with three arguments, all of which are erroneous. First, they have simply, frankly, concocted out of whole cloth a theory about, quote, multiple ascertainable events. They say that there might have been more than one future event that could have signaled the end of this contract. There's very fundamental problems with this argument. First and foremost, it's cut from whole cloth. There's simply no authority. But perhaps even more fundamentally, it's wrong on the merits. None of the three other admittedly ascertainable events, the beginning of the band receiving recording royalties, a totally separate stream of money that happens later, or the end of Supertramp's existence as a band or the copyright expirations, none of those necessarily will imply termination of the agreement. It's only the cessation of revenue that necessarily will imply termination of the agreement, and that's the legal standard under the California Supreme Court's decision in consolidated theaters and all of the other cases that we've cited. The second erroneous argument that the appellees make is they attempt to rely on the alleged unexpressed subjective intent of Mr. Hodgson. That, of course, is contrary to clear, longstanding California contract interpretation law. And an example of this is they argue there was testimony in the record that Mr. Hodgson entered into this agreement to keep his bandmates happy. One of our appellants remembered that. But what the meaning of that is purely subjective. Mr. Hodgson says, well, happiness meant financial security. So as soon as they became, quote, happy financially, then he had supposedly the right to terminate, which of course he didn't do for decades. But an equally logical understanding would be happiness would be to reach a fair and equitable result. And that is likely what the parties had in mind, or at least certainly could have been, that it was fair and equitable to split this revenue, that the songwriting was important to the value of this asset, this group of songs. And the songwriters took more than 50 percent of the allocation. But the other three members arranged and performed and recorded and toured for decades promoting those songs. And all of their efforts certainly contributed to the value of this asset, which is continuing all these years later to generate revenue. It wasn't just the songs. There's no indication in the record that these were songwriters in demand. They were not. They became successful only as Supertramp songwriters. And, in fact, the record indicates that Mr. Pelley's, Hodgson, and Davey's started the band in 1969 and Supertramp didn't become successful until 1973 when the current lineup manifested with our three clients. Finally, very quickly, the third fallacy is to claim that the dichotomy is either this unilateral right of Mr. Hodgson to simply just say, I've had enough honoring my contract versus a, quote, perpetual obligation. It's not perpetual in the literal sense. Nobody uses perpetual in that sense. Imperpetuity has a colloquial meaning. And, in this case, it's obvious that it means until the revenue stops flowing. The only perpetual contract that one can even think of would involve non-coastal real property and we have a rule against perpetuities. Perpetual meaning until the end of time doesn't exist in the real world. So that was a false dichotomy. And I'll reserve the remainder of my time. Thank you very much. All right. Thank you, Counsel. You used up all of your time and then some. If you need rebuttal, I'll give you a minute. Okay. Mr. Meadow. Yes. Good morning, Your Honors. Robin Meadow representing the Appellees. Justice Mosk once said, if you ask the wrong question, you get the wrong answer. And from the very beginning of my friend's remarks, he asked the wrong question. He said, what we have to figure out is whether there is an ascertainable event that definitely terminates the contract. And once we find that, we know that that is the date of termination. But that's not how California law of contract interpretation works. And he said it during his argument and it's in their brief and we agree on this principle. A court's paramount goal, this is from page 29 of the opening brief. A court's paramount goal in interpreting any contract is to enforce the intent of the contracting parties. And a gloss on this from the RMR case, which both parties also rely on, says this. We gain insight by divining the purpose of the contract. Understanding what the parties were trying to accomplish can illuminate their contractual language. Now, this case differs from the entire line of cases that the plaintiffs rely on. I'll call them stream of income cases. It's the sale of a trade secret or acquiring accounts or selling a product or something. None of them involve the consideration of extrinsic evidence regarding the circumstances under which the contract was formed. As far as the opinion reveals, there was no evidence other than the contract itself. So you have the contract, which provides for the sale of the product or whatever it is, and you have and you certainly do have a definite end point. Although I have to say it's kind of a truism. In any stream of income contract, virtually any stream of income, there's going to be a time when that stream of income ends. The purchaser of the trade secret stops selling the product. There's no income. Copyrights expire. There's no income. There is always that kind of event, but it is not the case that any court has said that once you find that event, you know that that's what the parties intended as the term of their contract. We're supposed to look to the subject matter of the agreement to determine whether it supports an implied term of duration, correct? I'm sorry, I couldn't hear you. We're supposed to look at the subject matter of the agreement to see whether it supports an implied duration, correct? At the subject matter and the circumstances. Well, what is the subject matter of the agreement? Well, if you look at just the agreement itself, the subject matter is the split of royalties, but the agreement itself doesn't explain anything about it. And the surrounding circumstances do explain it. All of the plaintiffs and Mr. Hodgson testified that the reason this contract was entered into was because the plaintiffs were experiencing financial difficulties, financial poverty, as the appellant's brief puts it, because they weren't getting any of the publishing income. And it's not correct that it's just Mr. Hodgson's subjective intent. The parties discussed this, and their recollection on this subject is uniform. This was the problem they were trying to solve. You can't tell that from the... Is there some ascertainable point in time that you could point to that would say, oh, now the parties, now everybody's happy? Well, I expect they were happy when they got the biggest recording deal that A&M Records ever did. I would expect, I mean, they seemed pretty unhappy in 1984 when Hodges left and did not dispute the existence of this agreement. Well, that's a complicated agreement. It's like 35 single-spaced, dense pages. I've read it. We've read it. Okay. And it covers a lot of subjects. It's all about what the remaining band members are going to pay Mr. Hodgson, and it does have a lot of material in it. It's also fairly close in time. I would say this, though. If the goal of this subject was to keep the band working and happy, and I think that's the phrase that's been provided by both parties, you could say the fact of Mr. Hodgson's departure, it isn't the same band anymore. Mr. Thompson's departure, it isn't the same band anymore. But if you fast-forward to 2011, the band's last concert, or when they canceled a concert in 2015, or when Mr. Davies says there is no band, or rather there won't be any more concerts in about 2018, there certainly isn't a band anymore. And whatever it was that the band members were doing in order to persuade Mr. Hodgson and Mr. Davies to share their royalties was over. So, again, Your Honors. Can you clarify something for me? I'll try. So the Memorandum of Agreement, 1977, talks about any compositions recorded by the performing group Supertramp. So that would cover only those songs that were written and, I guess, produced or sung by the group that was together. But after it was apart, it wouldn't cover royalties from, say, songs that Mr. Hodges wrote after 1984, right? Right. But it would cover all the royalties from all the songs that they did together. All compositions. Yes. I mean, it certainly... I mean, that's what it seems to say. Yes. I mean, I don't think there's a controversy over... Okay, so it covers all that. So then we're looking at royalties from that subset of songs, like 1977 to 1984. Are those songs still earning royalties right now? I don't know, but I assume they are.  I mean, they may earn royalties. You know, counsel's correct. The statement in our brief is not correct. The copyrights have not expired, and it's a long time before they will. As he said, there's a lot of reasons why, or at least several reasons why, the royalties might terminate. So I think it does have that coverage, and for purposes of this appeal, we assume they're continuing. The question is how you look at the rights of the parties. And again, we need to look at why the parties made the contract. And unlike the sale of a contract, they were trying to solve a specific problem. They identified the problem. Their recollections are remarkably consistent about the essence of the problem they were trying to solve, which was a temporary problem. Now, they didn't use that term. They didn't talk about it at the time. But actually, what's significant is that in all of these people's recollection of the conversation, not one person said a word about the duration of the contract, and there is no evidence that any of the plaintiffs even thought about that. So it's an unusual case in which there is actually a body of evidence that suggests that there was no contemplated duration at all. That's an indefinite contract. They didn't think about it. They didn't have any intent. And once again, the court's goal, the goal of this exercise, is not to figure out if there's an ascertainable event, but to figure out what the parties intended to accomplish. And even the... But there's no evidence that they intended there to be an at-will agreement, right? There's no evidence one way or the other. The course of dealing under the contract went on for close to 30 years, 40 years almost, 30? Yes. So I have one question. If you just look at the stream of payments, the songwriting royalties in isolation, would you agree that that's a future ascertainable event that can be determined with certainty, if you just look at that provision in isolation? The contract doesn't state that event. There is such an event. I don't dispute that. But I would add that there's another, even if we disregard all of the prior things that happened over those 40 years, there is another ascertainable event, and that's the end of the band. You could have end of the royalties, or you could have the end of the band as an ascertainable event that could have... This is your multiple ascertainable events argument. And do you have any cases where courts have said there's more than one ascertainable event here, and therefore we're not going to imply a term and we're just going to say it's an at-will agreement? As far as I can tell, there isn't a case that addresses that question, and there's a good reason for that. The cases, as I mentioned earlier, that have all come up in this context are cases where there is a singular initial act, a simple act, no evidence of surrounding circumstances of the contract, and only one. As far as the opinions revealed, we don't know what the parties argued. But in those cases, there is not just an ascertainable event, but only one ascertainable event. If you have more than one ascertainable event, then by definition you have to pick one, and there's no basis in this record to choose between them. And if there's no basis to choose between them, then you can't have a definite term of the contract. Again, this is a unique case. As far as I know, neither side has found any cases, any stream of income cases, where there are surrounding circumstances that the court requires the parties to examine. Consolidated head surrounding circumstances, whether there were stage plays going, RMR is a great example of the examination of surrounding circumstances. This is the water trucking contract case where there was a lot of discussion about the parties' negotiations in order for the court to come to the conclusion that it did. The court aggressively considered those. The plaintiffs essentially want the court to ignore the surrounding circumstances, and that's what they mean when they say once you find that ascertainable event, the case is over. That's not the law. Warren, not Warren, the Listerine case, that case itself says we look at this if, in fact, that's what the parties intended. They bring it back to intent. You're over your time. I'm over my time. Thank you, Your Honor. Thank you very much, counsel. I'll give you a minute, Mr. Berg. Very briefly, Your Honor, all of the cases involved consideration of the circumstances. Consolidated theaters did, Lura did, and the New York case, Warner-Lampert did, the Listerine case. RMR was a case in which the court found there was an express termination, really inapposite to this case. We do not ask the court to ignore anything in the record, but the only agreement that I'm aware of is that all parties agreed that the contract was intended to make the parties happy. The question is, what did that mean? And that's the subjective, unexpressed intent. Mr. Hobson now claims 40, now 50 years later, that it meant, well, they'll become happy when they make money so I can terminate. But, again, the happiness that they're talking about could have any number of meanings, including that this was the fair and equitable outcome. And I would ask the court to take a look, please, at footnotes five and six in our reply brief. By 1984, Mr. Hodgson already had the benefit of our client's consideration. The arranging, performing, recording, and touring that turned these songs into extremely valuable assets. And finally, your honors, the end of the ban, Super Trump, in no way would have necessarily implied the end of this agreement to share the ongoing stream of revenue that continues to exist and presumably will continue to exist for many years, probably until the copyrights expire. Thank you very much. Thank you very much, counsel. Thompson versus Hodgson is submitted.
judges: WARDLAW, OWENS, Hinderaker